[No. 6909.]

## LIUTZ V. DENVER CITY TRAMWAY CO.

1. CONTRIBUTORY NEGLIGENCE—*Examples*—Deceased stepped so immediately in front of a street car that it was impossible to prevent injury to her. Those in charge of the car did everything that could reasonably be expected of them to avoid the collision. Her death gave no action.

2. ——*Last Clear Chance*—In order to the application of the doctrine of the "Last Clear Chance" the circumstances must present a clear chance to avert injury by the exercise of reasonable care. All the circumstances are to be considered. One who, without fault on his part, is presented with the sudden appearance of instant and awful danger to a human being is not culpable for merely failing to manifest the same presence of mind, or exercise the same care and effort, as might be expected in an ordinary situation.

3. INSTRUCTIONS—*Repetition*—Unnecessary repetition in the charge to the jury, though reprehensible, is not necessarily error; e. g. the frequent repetition of the phrase "verdict for the defendant" is not prejudicial, where the facts warranting such a verdict are clearly defined.

4. FAIR TRIAL—*Evil Practice to Influence Jurors—Duty of Court and Attorneys*—If it is made to appear that persons employed by a suitor hang about the purlieus of the court, and the approaches thereto, mingle with those summoned as jurors, converse with them touching causes in which the suitor is concerned, and by flattery, ridicule, and like insidious means, endeavor to improperly influence them, the court has power to punish and suppress the practice, and should not hesitate to employ drastic measures to that end.

And it is the duty of attorneys who have knowledge and evidence of such scandalous practices, to bring the matter to the attention of the court, and co-operate in suppressing the evil.

A verdict shown to have been influenced by such practices should be unhesitatingly vacated.

5. NEW TRIAL—*Affidavits of Jurors*, as to the ground upon which the verdict was reached, will not, as a general rule, be received to impeach it.

6. ——*Improper Remarks to Jurors*, which manifestly had no effect upon their deliberations is not ground for a new trial.

7. ——*Treating Jurors*—That the attorney of the successful party treated four of the jurors to cigars, after the verdict, merely in a way of civility, and without any design or forethought, *held*, no ground to vacate the verdict, though the court suggested that, upon ethical grounds the act of the attorney was indiscreet.


*Error to Denver District Court.*—Hon. HUBERT L. SHATTUCK, Judge.


Messrs. STARK & MARTIN, Mr. GEORGE S. REDD and Mr. GEORGE STIDGER, for plaintiff in error.

Mr. GERALD HUGHES and Mr. HOWARD S. ROBERTSON, for defendant in error.

Mr. JUSTICE MUSSER delivered the opinion of the court:

This cause was in this court before and the former opinion is reported in 43 Colo. 58. The facts relative to the accident, in which the wife of the plaintiff in error received injuries which caused her death, are substantially the same in this record as narrated in the former opinion.

Mrs. Liutz, a young and vigorous woman, started diagonally across Larimer street, in Denver, near its intersection with Twenty-fifth street, obviously intending to board an approaching car at the usual place on the opposite side of Twenty-fifth street. She was carrying a small child in her arms, and as she proceeded she signalled the car. A gong was sounded. She stepped upon the track immediately in front of the car, was struck by the fender or rail guard, which projected forward from the front of the car over the rails, fell upon it, struggled an instant and then fell from the fender on the right side in the space between the fender and the front wheel. She stepped upon the track at about the middle of Twenty-fifth street. The car was running slowly, evidently slowing up to make the stop on the opposite side, for there was evidence that the brake had been applied. There was nothing in the situation to indicate to the motorman that she was about to attempt to cross the track before the car had passed her. Her signals indicated that she knew the car was approaching, and the gong reminded her of that fact. The car was moving at a lawful rate of speed. The brakes were in good order. One witness testified that the car was five or six feet from her when she stepped upon the track, and another that it was not more than seven or eight feet away. The motorman testified that he was not more than six feet from her. These witnesses evidently estimated the distance with reference to the body of the car. Another testified that the projecting fender was not more than fifteen inches from

her.   Another testified that she was struck when she was about to step on the track and when she stepped on the track. So that she must have been struck by the fender almost the instant she stepped on the track.   The motorman immediately further applied the brake and the car was stopped within eight or ten feet after she was 'struck.   When the car was stopped Mrs. Liutz was lying on her stomach and the front wheel was resting between her limbs, near the trunk, or on the right limb and pelvis at the junction with the thigh on the side toward the rear of the car.   Her trunk was outside of the rails and the limbs were resting upon them.   The motorman and conductor immediately jumped off when the car stopped, and, after looking, decided that it was necessary to get the car off the body before it could be taken out.   The car was backed very slowly twelve or eighteen inches and Mrs. Liutz was then easily taken out and removed to a hospital where she died the next day.   Her right limb was fractured below the knee and there was another injury at the junction of the right thigh and pelvis, including both of them somewhat.

There were two causes of action in the complaint.   The first was based upon negligence in operating the car, in not stopping it in time to prevent the injury, and in not dropping the fender so as to prevent the body of Mrs. Liutz from getting under the car.   The second cause of action alleged the same things except with reference to the fender, and further alleged that the injury was inflicted by negligently backing the car after it had stopped.   The lower court directed a verdict for the defendant company on the first cause of action, and submitted to the jury the second cause of action with reference to the backing of the car, and the jury returned a verdict for the defendant company.   It is contended that the court erred in directing a verdict for defendant on the first cause of action.   In the former opinion it was held that up to the time the car stopped the company was not guilty of any negligence and that the injury to Mrs. Liutz by the forward mo-

tion was due entirely to her own negligence in stepping upon the track immediately in front of the car.

Upon reading the record now before us, we are not inclined to change the view of the matter heretofore announced, and the reasons are so fully discussed in the former opinion that it is unnecessary to discuss them here. Upon reading the whole record, it appears clear that only one conclusion can be drawn from the evidence, and that is, that any injury which was inflicted upon Mrs. Liutz by the forward motion of the car was due solely to her own act in stepping upon the track so immediately in front of the car that it was impossible to prevent injury to her, and that the motorman did all that in reason could have been expected of him. It is contended that even though Mrs. Liutz was negligent in stepping upon the track, the evidence showed that the front end of the fender was about a foot above the rails and if the motorman would have dropped it, as he might have done, she would not have gotten under the car, or at least there was a chance for the jury to say she would not. Many authorities are cited to the effect that notwithstanding the negligence of a plaintiff, if the defendant observed or should have observed such negligence in time to avert injurious consequences by the exercise of reasonable care, it is the duty of the defendant to exercise such care. That is commonly called the doctrine of last clear chance. This can be answered in two ways. It clearly appears from the evidence of all the witnesses who testified with any knowledge of how Mrs. Liutz fell from the fender that she did not fall from it in front so that it would pass over her, but that she fell off at the side in the space between the fender and the front wheel. Under these circumstances it is unlikely that the dropping of the front end of the fender would have availed anything.

If we are wrong in this it nevertheless is plain that in order to apply the doctrine mentioned to a state of facts the circumstances must be such as to present a last clear chance to avert injury by the exercise of reasonable care. In this

case the situation itself, as detailed by the witnesses, clearly indicates that there was not a fair opportunity, or any opportunity within reason, for the motorman to have overcome the consequences of Mrs. Liutz's act. These circumstances clearly show that her stepping on the track and falling from the fender were practically simultaneous, and that her negligence occurred for all practical purposes simultaneously with her fall from the fender and under the car. The circumstances, the suddenness of the whole transaction, the practically simultaneous occurrence of her negligence and her falling under the car excluded the idea of any chance for the motorman to have saved her. The facts and circumstances were clear and undisputed, fixed and unalterable, and no expert testimony could throw any light on them or change their inevitable result. To say that there was a chance would be to require of the human mind and muscle a rapidity and unerring precision of thought and action of which they are incapable, especially when that mind must have been shocked by the sudden appearance of instant and awful danger to a human being. Under such circumstances, what might be done in an ordinary situation, when there is no danger apparent or imminent, is inapplicable. The case of *Weitzman v. Nassau E. R. Co.*, 53 N. Y. Sup. 905, which the plaintiff in error says is exactly in point here, is entirely different in its facts. There, the motorman testified that he saw the child twenty feet away on the track before it was struck by the fender, and the child was carried a distance of from thirty-two to one hundred and fifty feet on the fender. After the motorman saw the child the car ran at least fifty-two feet, while the motorman testified that the car could have been stopped in forty-five feet. Such a state of facts is altogether different from the situation presented here, and this remark is applicable to the many other authorities cited. In *Griffith v. Tramway Co.*, 14 Colo. App. 504, the circumstances with reference to the stepping upon the track and the suddenness of the collision were substantially the same as here, and it was

there held that "the facts which would warrant an application of the doctrine, invoked by counsel, of a liability for an injury notwithstanding the negligence of a person injured, did not exist."

As has been said, the contention that the fatal injuries were caused by negligently backing the car was submitted to the jury. Complaint is made of several of the instructions given at the request of the defendant. In each of them the jury were told that if they found a certain state of facts the verdict should be for defendant. There was some repetition in the instructions, but it cannot be said that any one was the counterpart of the other. It is claimed that what repetition there was tended to confuse the jury, and that the frequent use of the phrase "verdict for defendant" gave undue prominence to the idea that the jury should so find. Each instruction was clear enough in itself and no claim is made that any of them incorrectly stated the law or recited facts not deducible from the evidence. Many authorities are cited showing that repetition in the instructions is to be avoided. All of them, however, save one, are to the effect that it is not error to refuse a correct instruction when the charge already contains the same thing expressly or substantially. This is undoubtedly good law, but that is far from saying that repetition is reversible error. In the one case of *State v. Legg,* 59 W. Va., 315, the court condemned the practice of repetition in instructions, but refused to say whether it was reversible error or not, and did not intimate what it would do in that behalf were it necessary. Of course unnecessary repetition in the charge is to be condemned, but that is not saying that it must be regarded as reversible error. It might become so if it tended to confuse the jury. In the present case, however, the instructions, even with the repetition they may have contained, cleared confusion rather than produced it. The conflicting claims of plaintiff were likely to produce confusion. It was first contended that the fatal injury was inflicted by the car before it stopped in its forward motion, and next that

it was inflicted, not by the forward motion, but by negligently backing it after it had stopped. The testimony introduced by the plaintiff to support each of these claims was blended together. Now the fact was that the plaintiff could not recover on his first contention because in that case the injury would have been caused by the negligence of Mrs. Liutz, and if that contention were true the second could not be, and if the second contention were true the first could not be. It was very likely that such a state of affairs would produce confusion in the minds of the jury and it was very proper for the court to give instructions that would place the matter clearly before them in its various phases. This is what the instructions did. The plaintiff was not entitled to have the confusion which he created continue with the jury, while the defendant was entitled to have the matter fairly presented to them. We cannot say that the repetition of the phrase "verdict for the defendant" would prejudice them when the facts were clearly presented upon which such a verdict should be based. If they did not find the facts as predicated in any of the instructions they certainly knew that their verdict should not be for the defendant, and if the facts were as predicated they could not render any other verdict.

In the motion for a new trial it was alleged:

1.  That the Tramway Company made it a practice to keep two men about the court house to mingle with prospective jurors, talk with them particularly with reference to Tramway cases, and by flattery, ridicule and other insidious means endeavor to improperly influence them so that verdicts might be returned for the company.

2.  That one of the jurors in this case had been informed that if a verdict was not reached before bed-time the jury would be compelled to sleep over night in beds infected with vermin, and that rather than sleep in such a bed the juror, against his will, agreed to the verdict for the defendant.

3. That the attorney for defendant was guilty of misconduct in treating the jurors to cigars after the receipt of the verdict.

When these charges were brought to the attention of the court, an investigation was ordered and plaintiff was directed to produce his evidence. A hearing was had, much testimony was taken, and the court found that the charges were not sustained and overruled the motion for a new trial. Unless the finding of the court was manifestly against the weight of the testimony, or its discretion was abused, we can not disturb this finding. It is enough to say that in the cold record before us there does not appear sufficient evidence to sustain the charges. The district judge saw the witnesses on the stand, observed their demeanor, interrogated many of them himself, and was much more competent to judge of their testimony than an appellate court. If the first charge were true, that the Tramway Company made it a practice to influence jurors as alleged, such a practice is to be condemned in the severest terms. The district court, in such a case, has it within its power to severely punish any who may resort to such an evil practice, and should not hesitate to employ drastic measures to stamp it out. It is the duty of attorneys of the court, who are aware of such conditions and have evidence thereof, to co-operate with the court in bringing offenders to punishment and in putting a stop to such a condition of corruption. Verdicts influenced thereby should unhesitatingly be set aside. However, before anything can be done sufficient evidence must be produced. Men cannot be punished or verdicts set aside for such a reason upon mere suspicion and without evidence. If there is any evidence at all in this record of such a practice it is very meager indeed, and there is no evidence whatever that the jurors in the present case ever heard of it or were in any manner influenced in their present verdict thereby. On the contrary, it affirmatively appears, uncontradicted, that the jury was free from such an influence. An affidavit of the juror, who claimed that his verdict

was induced by what he had heard of the condition of the beds, was filed to support that charge. Section 236, Rev. Code, provides when an affidavit may be used to impeach the verdict of a jury, and this court has held that no affidavit of a juror will be received to impeach the verdict for misconduct of the jury except as provided in that section, and that is when the verdict is brought about by a resort to the determination of chance. *Richards v. Richards*, 20 Colo., 303. The particular misconduct that is sought to be charged to the jury in this case was that there was some conversation to the effect that if a verdict was not reached they would have to sleep in beds infected with vermin. As a general rule, affidavits of jurors stating the ground upon which they rendered their verdict will not be received to impeach it.—*Wray v. Carpenter*, 16 Colo. 271. In the hearing on the motion for a new trial each of the other eleven jurors were interrogated with reference to this matter. Many of them said that they heard some remarks with regard to vermin in the beds, but it did not seem to make any impression upon them, and some of them regarded the talk more in the nature of a joke. The verdict was rendered immediately after the evening meal, quite a while before bed-time and before the juror would know that he was to sleep over night in the beds provided by the county. He did not know that the beds were in such a condition. He did not attempt in any way to have the authorities provide proper beds. There was nothing in the situation to alarm him, or to cause him to violate his sworn duty as a juror. There was no error committed in overruling the motion on that ground.

The facts with reference to the treating of jurors with cigars appears to be as follows: The jury agreed on their verdict in the evening, sealed it and dispersed to their homes. The next morning they returned the verdict into court. It was received and they were dismissed. After this, in going down the elevator to the lower floor of the court house, defendant's attorney and some of the jurors were together.

Someone said something about cigars, and, on reaching the floor where they were to be obtained, the defendant's attorney treated each of four jurors to one cigar. There is no statute in this state forbidding such a thing. The occurrence seems only to have been an innocent one, and is the only one of its kind shown in this record. How it could have influenced the verdict which had been returned and received can not be conceived. The cases cited by plaintiff in error are not in point. The Vermont cases, *Baker v. Jacobs,* 23 Atl. 588, and *Shattuck v. Wrought Iron R. Co.,* 38 Atl. 72, were based upon a statute. In *Marshall v. Watson,* 40 S. W. 352, one of the parties during an adjournment and while the case was on trial entertained two of the jurors at a restaurant. Afterward the verdict was returned in favor of the host. In *Johnson v. Hobart,* 45 Fed. 542, and *Ensign v. Harney,* 18 N. W. 73, the matter occurred before the cases were submitted to the juries for verdict. In *McLaughlin v. Hinds,* 38 N. E. 136, the attorneys for each party and some of the jury entered a saloon and indulged in cigars and drink after the verdict. The court refused to set the verdict aside because each party was guilty, and said it would not hesitate to do so if the attorney for the successful party had been alone with the jury. The remark did not apply to the actual facts in the case and besides the conduct of the attorneys and jurors was flagrant, and was enough to show, if participated in by the successful attorney and the jurors, that the latter were so prejudiced in his favor as to taint the verdict. The conduct complained of occurred after the verdict was reached and sealed and before its return into court. In *End. R. of O. of K. P. v. Steele,* 63 S. W. 1126, some of the jurors, when examined for service, had answered that they had not served on a jury within two years, when the fact was that they had and were thereby rendered incompetent. This fact was linked with the fact that they drank with the brother of the plaintiff after the verdict to show that they were anxious to sit upon the case and that they were not the fair and impartial jurors that the par-

ties had a right to demand. *Scott v. Tubbs*, 43 Colo. 221, was a condemnation proceeding. After the jury had viewed the premises and before they returned to the court room or made their award, four of the jurors accompanied the petitioner, at his invitation, to a saloon and drank with him. This court correctly held that a new trial should have been granted. Courts should guard the purity of the jury with jealous care and see to it, as far as within them lies, that jurors are not tampered with so that the verdicts that are returned may be free from taint and prejudice and be the honest convictions of the jury upon the law and the evidence. Too great a care in this behalf cannot be taken, yet at the same time courts should not misconceive their duties and go so far as to work injustice. In *Vane et al. v. City of Evanston*, 150 Ill. 616, the rule was announced:

"That customary offices of civility, and ordinary hospitality or courtesy, extended by the successful litigant, when not designed or calculated to influence the juror or jurors in their consideration of the case, and which are devoid of suspicion, will not afford sufficient ground for setting the verdict aside and awarding a new trial."

And in *Gale agt. N. Y. C. & H. R. R. R. Co.*, 53 Howard's Prac. 385, it is said:

"When, however, the court is satisfied that there has been no attempt by the successful party to unduly influence a juror, either by conversation or by placing him under obligations, and that his action has not in fact been improperly influenced, then, even though the act may have been indiscreet, the court will not disturb the verdict."

These utterances of the courts and others of like character are quoted and the principles therein announced followed in the case of *Mo. Pac. Ry. Co. v. Bowman*, 75 Pac. 482 (Kans.). There is an entire absence of any indication that the attorney for the defendant treated the jurors to cigars, in any other spirit than one of civility, hospitality and courtesy that came to him on the spur of the moment after the verdict,

without any design or forethought, but upon a jocular suggestion, as such things often innocently occur.  It does not appear that is was customary for him to do so, or that the jurors bore such relations to him that they expected it of him.  The act is entirely devoid of suspicion.  It could not have influenced a verdict already rendered.  It might be said, upon ethical grounds, that the act of the attorney was indiscreet, but that affords no reason for setting aside the verdict.  The judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WHITE and Mr. JUSTICE GARRIGUES concur.

Decided January 6, A. D. 1913  .Rehearing denied April 7, A. D. 1913.