In re KELLY et al.

(District Court, D. Montana. June 13, 1917.)

No. 2860.

1. CONTEMPT ☞60(3)—PROCEEDINGS TO PUNISH—SUFFICIENCY OF EVIDENCE.
   In a proceeding to punish attorneys for defendants in a criminal case for contempt, evidence *held* to show that one of the attorneys intentionally and knowingly visited and conversed with one of the jurors, bought a drink for him, and drank with him, and that he visited and conversed with another juror, and promised such juror introductions to legislators, requested by the juror to promote a proposed bill, and that the other attorney on numerous occasions intentionally and knowingly visited and conversed with the same juror.

2. CONTEMPT ☞14—MISCONDUCT AFFECTING JURY.
   Such conduct of the attorneys constituted misbehavior obstructing the administration of justice, requiring that they be fined.

3. CONTEMPT ☞14—MISCONDUCT AFFECTING JURY.
   While mere chance meetings, passing salutations, or brief conversation on indifferent topics between jurors and counsel, cannot always be avoided, and are not in themselves condemned, lengthy visits and conversations, apart from others, whether or not about the case, drinks, and other hospitality, entertainment, hopes aroused, and favors directly or indirectly granted or promised, are misbehavior obstructing the administration of justice.

4. CONTEMPT ☞14—MISCONDUCT AFFECTING JURY.
   Where attorneys intentionally visited with jurors, conversed with them, made promises, or aroused hopes, and drank with one of them, they were guilty of the intent necessary to make their conduct contempt, though they did not intend to influence the jurors.

5. CONTEMPT. ☞14—MISCONDUCT AFFECTING JURY.
   Counsel, who are embarrassed by the advances of a juror during the trial of a case, to relieve themselves of liability for contempt, should bring the matter to the court's attention, instead of encouraging such advances.

Proceedings to punish D. M. Kelly and A. J. Galen for contempt. Defendants fined.

B. K. Wheeler, U. S. Dist. Atty., of Butte, Mont., H. G. Murphy, Asst. U. S. Atty., of Helena, Mont., and James H. Baldwin, Asst. U. S. Atty., of Butte, Mont., for the United States.

L. O. Evans and F. Walker, both of Butte, Mont., and W. T. Pigott, F. W. Mettler, and E. G. Toomey, all of Helena, Mont., for defendants.

BOURQUIN, District Judge.   In these contempt proceedings the charges are that respondents were attorneys for two of ten defendants in a criminal case tried herein, and therein were guilty of misbehavior obstructing the administration of justice, in this, viz.:   That during intervals of the trial they knowingly visited and conversed with certain members of the jury, "with a view of improperly influencing" them in said case; that with like view Galen so visited and conversed with Juror Warner, furnished him liquid refreshments, and with him partook thereof; that with like view Kelly so visited and conversed with

Juror Brown, and furnished him liquid refreshments; that with like view both respondents so visited and conversed with Juror Warner, and promised to introduce him to members of the Legislature then in session, to secure him support for a proposed bill which Warner was promoting. After some rather technical objections, not argued, respondents pleaded not guilty. Although the record and evidence in the criminal case cannot be resorted to nor considered, because not introduced at the hearing herein, from the evidence submitted at said hearing enough appears to demonstrate said criminal case was of importance, attracted attention, was on trial some two weeks, and respondents' clients were acquitted. There was a total of seven attorneys for the defense, but respondents were the only attorneys for their clients.

[1] Referring to the charge affecting Kelly in relation to Juror Brown, Murphy, assistant district attorney, for the prosecution, testified that one evening during the trial he was with the district attorney in the Placer Hotel lobby, and saw Kelly and Brown talking together, standing about the center of the lobby, for 15 to 20 minutes, Murphy then departing.

Rankin, since said trial attorney for two said defendants convicted, and a sympathetic friend and sometime ally of the district attorney, delighted with the acquittal of respondents' clients, for the prosecution testified that in said lobby, apparently following Murphy's departure, he (Rankin), in conversation with the district attorney, there saw Kelly and Brown talking together; that after some moments witness and the district attorney went into the adjacent barroom and drank with Galen; that Kelly and Brown came into the bar, and the district attorney remarked they were about or going to drink; that Cowley, another attorney for a defendant in the criminal case, was about to or did invite witness and the district attorney to drink; the latter remarked he would not drink with a juror, and moved by discretion witness withdrew.

Juror Brown, a "substantial rancher," old and close friend of Kelly, for the prosecution testified he did not remember talking to Kelly during the trial, in said hotel lobby; that he did not go into the bar with Kelly, but thinks on the occasion referred to he did with De Hart; that Kelly was there and asked him to drink, which he did; that he and Kelly were accustomed to drink together; that (in response to leading questions on cross-examination) he was positive he did not talk with Kelly during the trial, and that the drink no wise influenced his verdict; that when he had drank he thought he should not be there and walked out.

De Hart, for respondents, testified to entering said bar with Brown, but is unable to identify it as the night Kelly and Brown drank together. Galen, respondent, testified that he and Kelly went from Galen's office to said hotel and bar; that a crowd was present and he lost Kelly, but saw Rankin and the district attorney, and conversed with them; that he heard Kelly ask the district attorney to have a drink, and saw Juror Brown alongside or back of Kelly; that to Galen the district attorney criticized Kelly's association with the juror, Galen

responding, "He means no harm;" that he does not know where Kelly went when he and Galen entered the bar, but does not think it was 20 or 30 minutes later that the drink was had, but only an "appreciably short time"; that he did not see Kelly introduce Brown to Cowley; that Brown went out, and the district attorney adversely commented on the incident, Kelly responding he had known Brown a long time, a "high-class citizen," whom a "drink wouldn't bother."

Cowley, for respondents, testified that as he entered the bar Kelly said he was buying a drink; that Brown had drank, and Kelly introduced Brown to witness, Brown then leaving; that the district attorney said he would then drink, but did not want to drink with the juror; that witness said (because of circumstances) he saw nothing "wrong in this," and on cross-examination he testified that if, before he was introduced to Brown, he had been told Brown was a juror, he "would have felt a little bit queer about it."

Kelly, respondent, testified that he knew Brown well for some 10 years; that they were of like politics, and witness had held office in Brown's county; that it was custom for them to drink together; that, going with Galen from the latter's office to the hotel bar, they were separated along the bar; that Rankin withdrew, and witness drank with some parties; that he recalls De Hart and Brown; that he joined the district attorney, Galen, and Cowley, and found they were discussing the propriety of buying a drink while Brown was there; that he assured them Brown was a "very high class citizen," who "certainly would not consider" it; that it never occurred to witness, when buying the drink for Brown, that it was improper and might influence Brown as a juror; that he does not recall conversing with Brown in the hotel lobby, and does not remember introducing Brown to Cowley; that, if he conversed with Brown, it was casual, at no time about the criminal case; that he does not recall having any conversation with Brown during the trial, though he might have, and would not say he did not; that he gave no special invitation to Brown to drink, but included him in the party; that he did not go into the bar with Brown.

In the matter of the charge that Galen furnished liquid refreshments to Warner, while it fails of proof, it appears from Haven's (lawyer, witness at the criminal trial, and associate of the district attorney) testimony that one evening during the trial, in said hotel lobby he saw Galen stand, look, joined by Warner they conversed about a minute, then together went beyond and behind a post (pillar?) and out of Haven's vision, where were only the bar entrance and a stairway descending to a basement toilet room. It also appears from Atkinson's testimony that at the conclusion of the criminal case Warner admitted to the district attorney that he (Warner) had drank with Galen. It also appears that, subpœnaed by the prosecution for this hearing. Warner came to Helena, on the street met Galen, who told him to go to Mettler's office (one of respondents' counsel), which he did, from whence, on call from the district attorney, he went to the latter's office, and said to him he had not drank with Galen, and had not told the district attorney he had drank with Galen. It does not appear whether or not Galen and Mettler knew Warner was subpœnaed by the prose-

cution, when Warner went to Mettler's office. It is not intimated a party should not interview witnesses subpœnaed by the other party. An exclusive right to a witness is not acquired by first subpœnaing him. Witnesses are in aid of justice. Their knowledge is for the benefit of all parties, all of whom, before trial, may rightfully, but discreetly ascertain that knowledge.

Byrn, a government officer, testified that prior to this last incident he heard Warner deny to the district attorney that he had admitted drinking with Galen, then, when this was vigorously disputed, say, if he had drank with Galen, he did not remember it. Galen and Warner testify they did not go into the bar, nor drink together, and Warner that he had not admitted to the district attorney he had drank with Galen, and that when he went to the district attorney's office from Mettler's was not the first time he had to the district attorney denied drinking with Galen. Galen and Warner do not refer to nor identify the incident to which Haven testified.

In the matter of the charge that respondents visited and conversed with Warner and promised to introduce him to legislators, it appears Warner was interested and industrious in behalf of his proposed bill. A stranger to respondents, Warner was recommended to enlist their aid, for that they were ex-Attorney Generals of wide acquaintance, and he sought them out to that end. Warner testified he conversed with Kelly two different evenings, and asked him if he would introduce witness to legislators; that Kelly put him off the first time, did not think Kelly introduced him, though Kelly said something about waiting until after the trial, to talk about the bill, the second time.

Byrn testified that on the evening of the eleventh day of the trial, in the hotel lobby, he saw Juror Warner approach and speak to Kelly, who told Warner he could see him later; that later Warner did approach Kelly, showed him a document, they conversed some ten minutes, and separated. Kelly testified he recalled only two conversations with Warner, both the same evening and in the hotel lobby aforesaid: that Warner showed him the bill, asked what Kelly thought of it, and that Kelly introduce him; that witness answered he knew nothing relating to the subject of the bill, that he did not care to introduce Warner then, and that he had better wait until after the trial; that he felt uncomfortable talking to a juror, a stranger to him, felt necessity to be courteous, and not to offend by a rebuke; that, had it been Brown asking "me for a favor of that kind, I wouldn't have thought anything about it. I no doubt would have introduced him to the people" thereabout.

Warner also testified he might have had two conversations with Galen, only about the bill and requesting introductions; that to the best of his recollection Galen did not introduce him, but will not say Galen did not, he (Warner) met so many; that he does not remember from the jury box asking Galen about one Searls; that maybe at most he talked two or three times about the bill to Galen; that during a certain intermission in the final argument to the jury in the criminal case, in the court corridor, Galen did not put his arm on Warner's shoulder and talk to him. On cross-examination, in response to

a question whether Galen had not said, "I haven't got time to talk to you about" the bill, he answered, "Something similar." In response to other leading questions, he testified that in the said hotel lobby he was talking to one of respondents' clients—defendant and Galen approached and said he would rather Warner did not talk to said defendant, whereupon Warner asked why, Galen answering it did not look right; that he realized his error, thanked Galen, and asked if he could speak to Galen, who assented; that then for the first time he spoke to Galen about the bill; that his verdict at the trial was not · influenced by anything said to him by Kelly or Galen.

Byrn testified that, the same evening he saw Juror Warner approach Kelly, he saw Warner seated in the said hotel lobby, there being a fur auction and a dense crowd; that Galen approached Warner, and by the latter was shown a document, some slight conversation between them, Galen handed the document back to Warner and walked away; that he would not be positive one of respondents' clients—defendant did not approach Warner at the time Galen did, and does not believe said defendant was talking to Warner when Galen approached the latter. Byrn also testified that upon this evening in said lobby he saw two other counsel for another defendant approach and speak to Warner, "several words passed," and later saw Warner speak casually to said defendant.

Kirschwing, a good friend of the district attorney, who knew what the latter "was up against" in the trial of the criminal case, and knew "the lobby that was working," for the prosecution testified that dur-the certain ·intermission hereinbefore mentioned he saw Galen and Warner meet near the jury box, saw Warner whisper to Galen, Warner, followed by Galen, walk into the corridor, and there saw them converse, with Galen's arm around Warner's shoulder; that other jurors were scattered about in plain sight of the corridor incident. Haven's testimony in reference to a meeting, conversation, and departure in company of Galen and Warner is heretofore set out.

Galen, respondent, testified that Warner approached or spoke to him some four or five times during the trial—once, when Warner was talking to respondents' client, as related by Warner; again, the next morning, in the courtroom, Warner referring to said incident, said to Galen he (Warner) should have known better; again, at the fur auction, Warner handed Galen the bill, the latter only then conscious of Warner's presence. Galen looked at the title of the bill, handed it to Warner, remarking, "I haven't got time to fool with that," and walked away; again, one morning in the courtroom, in the presence of the district attorney, Warner asked Galen the name of Searls, of whom Galen had told Warner the night before at the hotel, and Galen again told him Searls' name; again, during the intermission heretofore referred to, Galen, nervous from the strain of the trial, he testified, procured a cigarette from one of his clients, went into the corridor, and while he was in meditation smoking, Warner stepped up and said, "I want to talk to you about my bill," to which Galen responded, "For Christ's sake wait until this trial is over;" that no more was said, they had not whispered or spoken in the courtroom, he had not followed

Warner into the corridor, he did not have his arm around Warner, and that at no time did he and Warner speak of the case; that all these several incidents were open, other persons by; that he does not believe he introduced Warner to any one. Neither Warner nor Galen was asked whether or not the latter promised such introduction. It is noted that neither Brown nor Warner was a guest of the hotel of the numerous incidents, and it does not appear respondents were.

Some six witnesses, including counsel for another defendant at the criminal trial, respondents' clients, and jurors, testified for respondents to circumstances tending to disprove Kirschwing's assertion that Warner whispered to Galen before the corridor incident. There is evidence that the jury deliberated upon their verdict all night, and that around midnight Kelly and two others interested, stood for some time upon the street, and looked over at the lighted windows of the jury room. Some claim that they signaled to the jurors is made, not to be treated seriously. It also appears that, immediately after the verdict was received, a defendant and his counsel, meeting Warner in a hotel dining room, invited him to partake of lunch with them, also invited Kelly, Galen, and another of counsel, and all ate lunch together. A few days later, these proceedings were instituted. Having in mind the charges and that the presumption of innocence requires their dismissal unless proven beyond reasonable doubt, and taking note of all matters and things in relation to witnesses and testimony that ought to be considered in the determination of issues, the findings are that during the trial of the criminal case respondent Kelly intentionally and knowingly visited and conversed with Juror Brown, and likewise furnished said juror liquid refreshment and partook thereof with him; that said respondent likewise visited and conversed with Juror Warner, and likewise promised said juror introductions to legislators, requested by the juror to promote a proposed bill; that respondent Galen intentionally and knowingly visited and conversed with Juror Warner.

Positive testimony that Kelly and Brown visited and conversed at length in the hotel lobby is not weakened by their inability to recall it. In view thereof, of their entrance into the bar, drinking together at Kelly's request and expense, the proof is satisfactory that together they went from said visit and conversation into the bar. Kelly, unable to see impropriety in the drink, would see none in the visit and conversation and journey to the bar; unable to see impropriety in visit and conversation with Juror Warner, a stranger, would see none in the like with Juror Brown, a friend, especially when Kelly would unhesitatingly grant favors to the juror friend, but not to the juror stranger. Apparently all present (even Brown) save Kelly and Galen, saw impropriety in Kelly treating Brown. The evidence is clear that Kelly and Juror Warner had a lengthy visit and conversation, that Warner's bill was discussed, that he asked Kelly to introduce him to legislators, that Kelly understood Warner's interest and purpose, and that he gave Warner to understand the introductions would be made after the trial.

Early in the trial Galen consented to Warner's speaking to him. Warner presented his bill to Galen, and the latter learned the former's

desires. Galen told him the name of Searls. At different times there were several exchanges of words between Galen and Warner, in themselves of no consequence, but in all serving to show how counsel and juror gravitated towards each other, like drifting ships upon a calm sea, or steel and magnet, or perhaps like men not averse to reciprocal favors. So on the day the prosecution rested, on a January evening they met in a hotel lobby, conversed, in company walked and disappeared from view, where their continuing journey must be either into the bar or down to a basement toilet.

A private visit, conversation, and journey, arousing warranted suspicion in view of all the circumstances, the burden shifted to Galen to explain, and no explanation was made. What their conversation, where went, how long, are still a mystery. Not identifying, referring to, or denying the incident, Galen and Warner only said they at no time together went into the bar or drank. The court corridor incident, Warner denied in toto. Kirschwing then gave his version, then Galen his. Since this incident was after Galen acquiesced in speech with Warner, after several exchanges between them, after Galen knew Warner's interest and desire in the matter of his bill, after their unexplained conversation and disappearance together, after habit could breed carelessness, after Galen, apparently, saw no impropriety in the association of Kelly and Brown at the bar, and since the evidence in relation to this corridor incident was after the verdict of acquittal and the immediate foregathering of Galen, Warner, and others at lunch, after Galen sent Warner to Mettler, and of which no more appears, all thereof, taken into consideration with all other circumstances properly in proof, stamp Kirschwing's version as more consistent and reasonable. However, involving a main issue, Kirschwing's version is not deemed proven beyond a reasonable doubt, and the incident is taken as perhaps not clear, and as merely illustrative and corroborative of the attraction between Galen and Warner.

[2] In view of and upon these findings the conclusion must be and is that respondents' conduct constituted misbehavior obstructing administration of justice, as charged, and they are and each of them is fined in the amount of $500 and costs. For protection, society depends upon juries. Like all human institutions, the jury system is not perfect; but society is not yet ready to accept any substitute. A philosophical writer declares the system is all that reconciles man to laws. One wonders if it is because the individual man contemplates his sometime violation of law, and hopes he at least may escape via a jury. Jurors, even as judges, are officers of courts and administrators of justice. Indeed, they are judges obligated to impartiality, fairness, and justice. Their oath and duty are to "true verdict render in accordance with the law and evidence in the case." The law and safety of man and property demand that oath be kept, that duty performed.

It follows that jurors must not be subjected to any variety of influence outside the jury box. The law forbids it. Any suspicion that jurors have been improperly influenced, tampered with, is intolerable; for it impairs public confidence in juries and verdicts, creates doubts of the court's ability to do justice, lessens respect for law, incites vio-

lation of law, and encourages primitive force to avenge or remedy wrongs, endangers persons and property, breeds mobs, riots, and lynch law, and makes for disorder, crime, and anarchy. Amongst the influences forbidden is undue familiarity between jurors and counsel. It is the more dangerous, in that proof is difficult, and its extent and effect are indeterminable. Generally founded on friendship or other altruistic basis, its insidious appeal is to man's finer nature; and, though powerful, charged that it has influenced him, he refuses to concede it, and denies its well-known probable effect upon his judgment in determining his verdict. He may be honestly unconscious of it, though moved by it.

[3] All counsel recognize this in their attempts to include their friends and to exclude their opponents' friends, when drawing juries. Drawn by chance, friends properly may be on juries; but during such times it is the duty of counsel to avoid appealing to friendship, to avoid renewing old friendships, as well as to avoid cultivating new ones. It is recognized a practical view must be taken. So mere chance meetings, passing salutations, brief conversation on indifferent topics, between jurors and counsel, cannot always be avoided, and are not in themselves condemned. But lengthy visits and conversations, apart from others, whether or not about the case, drinks and other hospitality, entertainment, hopes aroused, and favors directly or indirectly granted or promised, are under the ban of the law, are misbehavior obstructing administration of justice, and to be penalized according to circumstances. Counsel are strictly forbidden to thus compete for jurors' favor. It is to the credit of the bar that few counsel desire to, and practically all frown it down; for the least of these methods may influence jurors, and all of them arouse suspicion, adverse comment, just resentment, impair confidence, and, if permitted, convert the trial into a tragedy, and transform juries from administrators of justice to purveyors of injustice.

All this is conceded by respondents, but they contend their acts were but casual and commonplace courtesies, open, in proximity to other persons, and so not misbehavior obstructing administration of justice. Unfortunately for respondents, the evidence will not permit construction so favorable to them. When meetings are more or less frequent, and in consequence of the known desire of the jurors, if not of counsel, are unchecked and taken advantage of, are in part by appointment, they have not the quality of casualty. The strategy of openness, the solitude of the crowd, may be safer than secretiveness, when the influence is not brazen importunity and coarse bribery, but is only friendship and favors of courtesy.

[4] It is most disturbing to remember that, respondents' clients charged with felony, Warner entered the jury room and deliberated upon his verdict (of acquittal), with Kelly's promise and Galen's extended hope at least, that after the verdict they, men of rank and influence, would grant him favors ardently desired and solicited by him. And Brown, likewise, with consciousness of friendship renewed with Kelly, an old friend, with memory of a lengthy visit and conversation, subject unknown, with Kelly, and with whom he had during the trial made libation at the shrine of Bacchus. But it is contended respond-

ents had no intent to influence the jurors, that the latter testified they were not influenced, and hence respondents' conduct, while indiscreet, was not contemptuous. Lack of evil intent goes only in mitigation. They knew the jurors; they intended to visit, converse, make promises, or arouse hopes, drink with one of them, all as found herein. That makes up the offense charged. Intentionally adopting certain conduct in certain known circumstances, conduct forbidden by law under those circumstances, they intentionally violated law in the only sense in which the law considers intent. Ellis v. U. S., 206 U. S. 257, 27 Sup. Ct. 600, 51 L. Ed. 1047, 11 Ann. Cas. 589. Their conduct was intentional, and tended to influence the jurors favorably to their clients. It is not alone a question of ultimate intent, or of mere courtesy, or little monetary value, but it is also a question of the impression the conduct may make upon jurors. Friendship, courtesy, favors, are of the great and enduring forces. In the long run, they are stronger than mere money. Ends are often gained by good impressions created, where direct solicitation would fail. To reciprocate courtesies, hospitality, and favors is a natural impulse. A generous man remembers and responds in some kind. Only the base receive favors and return none. And untrained jurors of distant residence might hastily conclude by their verdict alone could they timely reciprocate counsels' attentions.

The conduct here involved is forbidden because of dangerous tendencies, of probable injury difficult of proof. The scales of justice are of delicate poise, and in a jury's hands may be affected by improper trifles light as air. A juror has no measure for his mental processes. He will not be heard to say this or that did or did not influence him. Public policy forbids, because his mental state is not accessible to other testimony. Mattox v. U. S., 146 U. S. 148, 13 Sup. Ct. 50, 36 L. Ed. 917. It is what respondents intentionally did, and its probable effect, not its intended or actual effect, that is the gist of their offending.

[5] First sought out by Warner, upon whom they are now severe, respondents should have checked his advances. If Warner is to be condemned, more are they; for he was but a layman, they learned in the law, and they told him he could converse with them. They encouraged him to continue to approach them. Warner's approach may have embarrassed them, and they were in duty bound to avoid offending him to their clients' prejudice. But they were equally obligated to avoid encouraging him to the government's prejudice. It would seem they could have relieved themselves of Warner as admirably as Galen relieved their client of Warner. Furthermore, they could and should have brought the matter to the court's attention, and a remedy would have been applied, even to dismissal of the juror. As it is, they have their share of responsibility for a situation that attracted attention, was the subject of "talk," created scandal, and that was calculated to affect the verdict, to say the least.

Perhaps the evil will be better appreciated by assuming a civil suit to have been involved, say a personal injury action against a corporation. Was this misbehavior in behalf of a successful plaintiff, a great outcry would be made anent the "ambulance chaser" and "purification

of the bar"; in behalf of a successful defendant, bitter denunciation would be visited upon the "soulless trust" and "corrupt corporation counsel." There would be some justification for both, and a new trial would be granted as of course. The cases almost unanimously so hold, and all condemn conduct like herein as reprehensible and intolerable.

Note, the new trials granted are for misbehavior obstructing administration of justice, and the conduct, when intentional, is punishable as contempt of court; for contempt of court is nothing but misbehavior obstructing administration of justice. Now, although not always remembered, the government in behalf of society is entitled to fair jury trials, even as persons are. But in criminal cases, though it be deprived of a fair trial by conduct like respondents', the law forbids it to have a new trial. It has no remedy, and can only discipline the offender and discourage imitators, by proceedings for contempt, as here. In general, see Scott v. Tubbs, 43 Colo. 221, 95 Pac. 540, 19 L. R. A. (N. S.) 733, and notes; Sandstrom v. Nav. Co., 69 Or. 194, 136 Pac. 878, 49 L. R. A. (N. S.) 889; Bank v. Gray (Wyo.) 154 Pac. 599; State v. Snow, 130 Minn. 206, 153 N. W. 526; Craig v. Pierson, 169 Ala. 548, 53 South. 803; State v. Clark, 134 Mo. App. 55, 114 S. W. 536; Bradshaw v. Degenhart, 15 Mont. 273, 39 Pac. 90, 48 Am. St. Rep. 677.

Crime, its repression and punishment, is a grave problem. Administration of criminal law, particularly when cases are for any reason important, is sufficiently difficult and ineffective to give color to the publicists' statement that it is a national disgrace. In so far as it is true, it is largely due (not overlooking that ancient rules based on vanished reasons make more to protect criminals against society than to protect society against criminals) to practice akin to those herein condemned. And it is so far true that statistics show this country in criminal law administration far less efficient than England, less than France, Germany, and but little more than Russia. The incident of the lunch is illustrative and significant. In some states it is a statutory offense to "treat" jurors, even after verdict and during the term. In his Penal Philosophy, the jurist Tarde, criticizing the jury system, gives credit to French juries in that, after acquittal, they are not known to "celebrate" with accused, and notes as worthy of mention that Garofalo cites one instance occuring in Italy in 1879. It is feared and lamented such celebrations are not uncommon in this country. See Hotel Co. v. Sooy, 197 Fed. 887, 118 C. C. A. 579; Liutz v. Railway Co., 54 Colo. 371, 131 Pac. 261.

Counsel must remember they, too, are officers of the courts, administrators of justice, oath-bound servants of society; that their first duty is not to their clients, as many suppose, but is to the administration of justice; that to this their clients' success is wholly subordinate; that their conduct ought to and must be scrupulously observant of law and ethics; and to the extent that they fail therein, they injure themselves, wrong their brothers at the bar, bring reproach upon an honorable profession, betray the courts, and defeat justice. When of sufficient extent, when they fail as here, they must, like others, respond at the bar of the court.