No. 12,854.

BOYLES *v.* THE PEOPLE.
(6 P. [2d] 7)

Decided November 30, 1931.

Mr. A. P. Tone Wilson, Mr. Clyde L. Starrett, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Wallace S. Porth, Assistant, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Roy Boyles was convicted of murder in the second degree, and was sentenced to imprisonment in the penitentiary for not less than 15 years. He says that the judgment should be reversed because: (1) The evidence was insufficient to support a conviction; (2) there was improper cross-examination of the defendant; (3) there was misconduct on the part of some of the jurors; and (4) the motion for a new trial was denied and sentence was pronounced by a judge who did not preside at the trial.

1. In April, 1929, Orval Lindburg was engaged in the business of selling sand obtained from the McVane farm in Kit Carson county, under an arrangement with Joe Boyles, who "operated" the farm, and the defendant was helping him. About Monday, the 29th, Lindburg disappeared. The day before that, he was seen wearing overalls, a blue shirt and tan shoes. In the latter part of May a witness found one of Lindburg's tan shoes in the field, in a direct line between the farm house and an old sand pit located in a dry creek. This led

to a search of the premises. Lindburg's body was found buried in the old sand pit. A foot or two above his body and parallel with it was the body of a dead hog. The hog's body was covered with several feet of dirt and sand. The only clothing on Lindburg's body consisted of underclothes, socks and a blue work shirt. There were marks on the body that might have been caused by dragging the body over the ground. A medical witness testified that the cause of death was a blow with a blunt instrument on the back of the head at the base of the skull. Concealed in patches of weeds and among ashes near the farm house were found overall buttons, square shoe eyelets, coat buttons, shirt buttons, suspender buttons, boot nails, hat eyelets, a Gem safety razor, a ring, a radiator petcock and a pipe ferrule, some of which were identified as the property of Lindburg.

The evidence tended to show the following additional facts: A day before his disappearance Lindburg had about $70 on his person. No money was found on his body or elsewhere. On Thursday, April 30, the defendant stated for the first time that Lindburg went away on Monday with a stranger, in an automobile driven by the latter, and that Lindburg said that if he did not return by Saturday he would not return at all. At the time he reported the departure, he had in his possession Lindburg's shotgun, his explanation being that Lindburg owed him $19 and, having no money with which to pay, told him if he did not return, to keep the gun. On the witness stand the defendant said the amount was $14. Saturday night preceding Lindburg's departure the defendant, his wife, Lindburg and one Al Johnson bottled beer at the farm house. The defendant and Lindburg were there again Sunday morning, drinking beer. They were there on Monday also, drinking beer. The defendant continued to work on the McVane place, hauling gravel, for about two weeks after Lindburg's disappearance.

About ten days after Lindburg disappeared a hog

owned by the witness Joe Boyles, died. The witness first noticed that there was something wrong with the hog the evening before it died. The witness and the defendant put the dead hog on a wagon. Hamilton, another witness, testified that Joe Boyles told him and the defendant to take the hog to the old sand pit. Joe Boyles testified that he did not believe he gave any such instructions. Hamilton drove the horses, and when they arrived at the old sand pit he inquired, ''Why isn't this as good as any place?'' and the defendant answered, ''It suits me if it does you.'' Thereupon Hamilton stopped the wagon about sixty feet from the sand pit, the hog was thrown out, and the defendant rolled it down the bank. While he was doing so Hamilton went for a scraper. They did not dig a place to bury the hog. It was laid on top of the surface by the defendant, and was covered with dirt by him and Hamilton.

A doctor testified that a blow such as Lindburg sustained would cause purging in the nose, ears and sometimes the eyes; that the amount of blood lost might be anywhere from a tablespoonful up to a pint or more. One witness testified that on Monday night he noticed that the farm house floor had been swept and scrubbed, and that the defendant told him that he had swept and scrubbed it. Another witness said that the defendant told him that the defendant and Lindburg cleaned up the house that morning, before Lindburg left. Three witnesses who saw the floor on Tuesday and Wednesday testified that it had been scrubbed. The defendant denied that he had scrubbed the floor. The defendant and several of his witnesses testified that when it rained the water sometimes came under the door and through the windows, settled on the floor and had to be swept out. But there was no testimony that any such condition existed at any time important in this connection. The evidence was all to the contrary. When asked whether there was any rain on Sunday, and whether the floor was wet on that day, the defendant answered, ''Not that I remember

of.'' He testified that there was no rain on Monday, It did not rain on Tuesday until sometime during the evening.

When asked what became of Lindburg's safety razor, he said that Lindburg had taken it with him, but the Gem safety razor was one of the articles found near the house among the ashes and weeds. He also stated that when Lindburg left he wore his tan shoes, but one of them, having square eyelets, was found in the manner already stated, and square shoe eyelets were among the articles found among the ashes and weeds.

The defendant made numerous contradictory statements in describing the stranger and his automobile, and with reference to the time of the stranger's arrival and the time of his departure with Lindburg. At one time he said that the stranger was tall; at another time, that he was short. At one time he said that he did not know the color of the stranger's hair, as the stranger kept his hat on; at another time, that the stranger took off his hat and that his hair was dark. The defendant made the following contradictory statements concerning the stranger's automobile: That it was a coupe; that he did not know what kind of a car it was; that it was a Chevrolet coupe with a Yuma county license; that the stranger was from St. Francis and had a Kansas tag on the car; that it was some kind of a big car; that he did not know whether it was a coupe, touring car, or sedan; that the car was a Ford. On the witness stand he said that it was some car other than a Ford; that he knows a Ford car when he sees it; that it might have been a Chevrolet. To several persons he stated that the stranger arrived in the morning; to two others he stated that it was "a little after noon, before we ate dinner." On cross-examination, the defendant stated that the stranger came a little after noon, before dinner, but that the defendant might have testified at the first trial that it was just a little before noon; that he would not say he did not so testify. On several occasions he said that Lindburg and

the stranger left at about 3 o'clock in the afternoon. On another occasion he said that they left in the forenoon.

On Tuesday the witness to whom the defendant announced Lindburg's departure noticed that he was very nervous about something. She testified that she had known him all his life and never had seen him so nervous before. Shortly after that, other witnesses noticed that the defendant was nervous—one said "awfully nervous" —and that during the conversation he turned his head away and looked down.

The defendant testified that Lindburg was "sore" at Joe Boyles because of the way he was treated over a radiator, and a day or two before he left he said that he might leave; that the radiator deal involved something like three dollars; that Lindburg and the stranger conversed out of the defendant's hearing; that when they left at about 3 o'clock in the afternoon Lindburg had a bundle and said he was going to Lamar, and that if he was not back by Saturday or Sunday he would not be back to farm the place; that a week or ten days before Lindburg left, the defendant saw the same stranger in the same car talking with Lindburg for five or ten minutes on the road; that they were a short distance from the defendant. The defendant further testified that he never had any trouble with Lindburg, did not know of his having any money on his person, and did not kill him. He denied making the contradictory statements testified to.

One of the defendant's witnesses testified that in March, Lindburg said that he did not think he would stay, because he and Joe Boyles could not get along together. Joe Boyles testified, in rebuttal, that there was no hard feeling between them. A witness testified that Lindburg had helped him fix a windmill about six rods straight west of the McVane place, and that on the Monday on which, according to the defendant, Lindburg left with the stranger, the witness and his two sons were working on the windmill and wanted to get Lindburg to help again;

that they watched the road, looking for him from early in the morning until about three-thirty in the afternoon, except at noon; that from the windmill the road leading to the McVane place is in sight; and that he did not see any car either going to or coming from the McVane place. A witness for the defendant testified to having seen Lindburg and some man in a Ford car conversing on the road a short time before Lindburg disappeared. Another witness testified that from a field to the south of the McVane place he saw a Ford car haul stuff away; that it was on the road running from the old sand pit to the Cheyenne Wells road; that four people got out, and two went one way and two the other; that this occurred between three days after the disappearance of Lindburg and the discovery of his body; but the witness did not know who they were, and there was nothing to indicate that they were not coming from the new sand pit —the one that was being worked—which was a short distance beyond the old sand pit and on the same road, or from the house, which was beyond the new sand pit and on the same road.

From a careful examination of the record, we are satisfied that the evidence justified a finding that beyond a reasonable doubt the defendant murdered Lindburg, and such was the finding of the jury.

2. On cross-examination, the defendant testified that while he was being questioned after his arrest, he was abused. He was asked who abused him, and he answered, "On several occasions they called me a damn liar." Whereupon he was asked: "Q. I will ask you if this is not what you have reference to, and didn't you say this or this in substance in the presence of these men you named: That you and Hamilton went down there and dug down about eighteen inches or two feet to bury the hog, and Mr. Magee said if you dug down that far you would have struck Lindburg's body?" An objection to the question as not proper cross-examination was overruled. Thereupon the cross-examination continued:

"Q. I will ask you if that was not the time they disputed your word? A. I did not say that." The court did not err in its ruling. Counsel was trying to find out what the defendant meant when he said they called him a liar. Besides, defendant had testified at length in his defense. The fact that his counsel had not asked him, in his direct examination, about the manner in which the hog was buried, did not make such cross-examination improper; nor did the fact that, upon rebuttal, witnesses contradicted the defendant's answer to the cross-examining question.

3. In support of the motion for a new trial the affidavits of three jurors were presented. The jurors sought to impeach the verdict, in which they had concurred, by stating the reasons that induced them to concur. They professed to have been influenced in part by considerations wholly outside the case, by a failure to recollect some of the testimony of a witness, by the failure of the defendant's wife to testify, by the effect of the verdict, and by a mistaken belief as to the maximum penalty that would be imposed. Such affidavits were not admissible to impeach the verdict. *Waite v. People,* 83 Colo. 162, 262 Pac. 1009; *Brasher v. People,* 81 Colo. 113, 253 Pac. 827; *Johnson v. People,* 33 Colo. 224, 80 Pac. 133; *Heller v. People,* 22 Colo. 11, 43 Pac. 124. And see *Liutz v. Denver City Tramway Co.,* 54 Colo. 371, 131 Pac. 258; *Richards v. Sanderson,* 39 Colo. 270, 89 Pac. 769; *Richards v. Richards,* 20 Colo. 303, 38 Pac. 323; *Wray v. Carpenter,* 16 Colo. 271, 27 Pac. 248; *Baxter v. Beckwith,* 25 Colo. App. 322, 137 Pac. 901; *McDonald v. Pless,* 238 U. S. 264, 35 Sup. Ct. 783; *Hyde v. United States,* 225 U. S. 347, 32 Sup. Ct. 793; *Hendrix v. United States,* 219 U. S. 79, 31 Sup. Ct. 193. In the opinion in the McDonald case, supra, the reason for the rule excluding such affidavits is thus stated: "But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could

be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference. * * * For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' ''

It states the rule too broadly to say that such affidavits are never admissible to impeach a verdict in a criminal case. In the Wray case, supra, we stated that it is the general rule. It would not be safe to lay down any inflexible rule, for, as was said by Mr. Justice Taney in *United States v. Reid* (12 How.), 53 U. S. 361: ''Cases might arise in which it would be impossible to refuse them [such affidavits] without violating the plainest principles of justice.'' In the McDonald case, supra, Mr. Justice Lamar said: ''This might occur in the gravest and most important cases;'' and he adds the following words, which we adopt as applicable to the present case: ''* * * without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule.''

4. After the filing of the motion for a new trial and before it was heard, Judge Finnicum, who presided at the trial, died. Judge Cornforth, his associate on the bench in that district, heard the motion, denied it and

passed sentence. One ground of the motion was that there was not sufficient evidence to support the verdict, While not questioning the power of a succeeding judge to pass upon and deny a motion for a new trial that does not challenge the sufficiency of the evidence, the defendant's counsel contend that where the sufficiency of the evidence is thus challenged, a succeeding judge has no power to do otherwise than order a new trial.

In *Camelin v. Smith,* 53 Colo. 574, 128 Pac. 1125, where, as shown by the record, the motion for a new trial challenged the sufficiency of the evidence, we said that by the weight of modern authority, the succeeding judge, presiding over the same court, may decide a motion for a new trial, citing *People, ex rel. Hambel v. McConnell,* 155 Ill. 192, 40 N. E. 608, where, also, the motion challenged the sufficiency of the evidence. The Camelin and McConnell cases, supra, were civil cases. It is contended that the rule should be different in criminal cases, because in such cases, where the sufficiency of the evidence is challenged, it is the trial court's duty, as stated in *Piel v. People,* 52 Colo. 1, 119 Pac. 687, to consider all the evidence and the facts and circumstances thereby presented, and, unless the court's reason and judgment approve the verdict, to grant a new trial. In 46 C. J., p. 403, §458, the rule is thus stated: "Where a motion for a new trial is heard, considered, and determined by a judge other than the one who presided at the trial, he must act on the evidence upon which the verdict was founded. According to some authorities, he is limited to an inspection of the record, but according to other authorities the moving party should be allowed to establish by any competent evidence the facts which transpired at the trial, and the evidence at the trial may be ascertained from the notes of the trial judge, his affidavit, an unofficial stenographic report sworn to be substantially accurate, the affidavits of counsel or of other persons who heard and remember the evidence, the reexamination of witnesses, or by any other lawful mode."

42

We must presume, in the absence of a showing to the contrary—and there is none—that in one or more of the permissible ways, the court was advised concerning the evidence. It was the duty of counsel who challenged the sufficiency of the evidence to advise the court fully with reference thereto, and we assume that they performed that duty. No doubt, in oral argument counsel stated the evidence and in what respect they considered it insufficient. There was an additional source of information at hand. The court could call to its assistance the official reporter who took the stenographic report of the testimony. The record shows that the bill of exceptions was tendered by the defendant's counsel to Judge Cornforth. In tendering it they impliedly vouched for its accuracy and completeness. Judge Cornforth signed it, certifying that it was a ''full and complete record of the entire proceedings,'' etc. If, upon examining the bill of exceptions, the court found that the evidence was insufficient to sustain the verdict, or if the court's reason and judgment did not approve the verdict, it was the duty of the court, of its own motion, to vacate its former order and grant a new trial. See *Lowe v. People,* 76 Colo. 603, 610, 234 Pac. 169, 172; *United States v. Harding,* 1 Wall. Jr. 127, 139, 26 Fed. Cas. No. 15,301. As it did not do so, we assume that the court's reason and judgment approved the verdict. We add that upon an examination of the entire record, our reason and judgment, also approve the verdict. That the succeeding judge may deny a motion for a new trial challenging the sufficiency of the evidence, see 20 R. C. L., p. 302; 46 C. J., p. 288; *Clark v. State,* 29 Okla. Cr. 243, 232 Pac. 953; *State v. Madry,* 93 S. C. 412, 76 S. E. 977.

It has been held that where the law permits an incoming judge to sign a bill of exceptions, he has the power to pass upon a motion for a new trial challenging the sufficiency of the evidence in a criminal case. *People v. Mosley,* 226 Mich. 295, 197 N. W. 541; *State, ex rel. Cosgrove v. Perkins,* 139 Mo. 106, 40 S. W. 650. Our

statutes have no provision for the allowance or signing of a bill of exceptions in criminal cases after the death of the trial judge. We have held that the act of 1911, concerning appeals and writs of error (S. L. 1911, c. 6) does not apply to criminal cases. *Denniss v. People,* 55 Colo. 120, 133 Pac. 741. Section 7109, C. L., provides for the attestation and proof of a bill of exceptions in criminal cases by affidavit when, and only when, the judge "shall neglect or refuse to allow and sign and seal" a bill of exceptions. However, it is the policy of our law, disclosed by legislation concerning criminal procedure, that every person convicted of crime may have his bill of execptions and a review on the evidence thus preserved; and it is our opinion that it was not intended that he should be deprived of that right by the death of the trial judge—a misfortune for which he is not responsible. We hold that in such a contingency the judge's successor has the power to approve, sign and seal the bill of exceptions. That is the course taken in the present case, and we approve it as correct. If the law were otherwise, the bill of exceptions in this case should be stricken from the record. The Mosley and Perkins cases, supra, afford, therefore, an additional reason for our ruling.

It is contended that a judge cannot properly weigh the testimony unless he has had the opportunity to observe the manner and demeanor of the witnesses while testifying, and that one who has not had that opportunity is not qualified to say that his reason and judgment approve the verdict. But the authorities cited above uphold the right of the succeeding judge to deny a motion for a new trial, notwithstanding such handicap.

In the present case we are not wholly without an intimation of Judge Finnicum's view concerning the sufficiency of the evidence. Its sufficiency was challenged by a motion for a directed verdict at the close of the people's case. The denial of the motion was a ruling that, in the court's opinion, the evidence for the people was sufficient; and if the evidence thereafter introduced

by the defendant caused the court to seriously doubt the defendant's guilt, the court had authority, which, in the interest of justice, it doubtless would have exercised, to direct a verdict of not guilty, notwithstanding the defendant's failure to renew such motion at the close of all the evidence.

Considering all the circumstances disclosed by the record, we are satisfied that the district court, when presided over by Judge Cornforth, acted within its power in denying the motion for a new trial and in imposing sentence.

We find no error in the record. The judgment, therefore, is affirmed.

Mr. Justice Hilliard did not participate.